Louis L. Friedman, J.
Plaintiff sues for personal injuries sustained by him on February 8, 1957 while he was working in connection with the construction of a housing project in Brooklyn known as Marlboro Houses. The project was being built by tbu New York City Housing Authority (not served in this . action) and the general contractors on the job were the defendants George F. Driscoll Company and Moccia Construction Corp., hereinafter designated as general contractors. The defendant Superior Construction Co., Inc., hereinafter referred *271 to as Superior, was a subcontractor of the general contractors, and Superior’s part of the work was to install iron window frames in the numerous buildings which were under construction.
Plaintiff was a foreman for another subcontractor on the job known as the Kelly Company. This latter company did the concrete and masonry work and, in addition thereto, was required to and did install a hod hoist on the outside of each of the buildings under construction. Building No. 3 is the one where the accident here involved happened, and it will only be said building to which reference will hereinafter be made.
Building No. 3 was 16 stories in height, and in order that men and material could be brought to the upper floors, it was necessary that they either walk up an inside stairway after said stairway was constructed, or that they be transported to the upper floors by means of this hod hoist which was erected alongside of the building and about four feet from the side thereof. The hoist was so erected that it was opposite a line of windows, one on each of the floors of said building, and when completely erected it extended for about 12 feet above the roof. It looked like an elevator or a lift which ran inside of this hoistway from the ground to the roof and its operation was controlled by its operator who was located on the ground. The plaintiff was the foreman of the crew which erected this hod hoist, and when the necessity therefor ceased, it was also his job to supervise its demolition. This demolition was accomplished by starting at the highest point of the hoist and removing it piece by piece. Thus, the 12 feet of hoist above the roof was first removed, then the portion from the roof to the sixteenth story, and so on down until the entire hoist was dismantled. The speed with which this was accomplished is best illustrated by the fact that after working but one day, the portion of the hoist which was above the tenth floor had already been removed, and on the morning of the accident, after only about two and a half hours of work, the portion between the tenth and eighth floors had also been removed.
Defendant Superior, as part of its contract, installed metal window frames in all of the window openings left by the bricklayers. There were about 41 windows on each floor, but since it was necessary that the hod hoist remain erected after the time when Superior was able to install its window frames, Superior did not install a window frame in the window opening which was immediately adjacent to said hod hoist. Thus, all of the window frames on each floor were installed prior to February 8, 1957 in all the window openings on each floor, with the exception of the one window opening on each floor *272 which was immediately adjacent to the hod hoist.
The testimony on the trial showed that it was the obligation of the general contractors to co-ordinate the work of all of the 25 or 30 subcontractors on the job as well as their employees. When it became apparent to the general contractors, through their superintendent, that the plaintiff and his crew were ready to demolish the hod hoist, and that when so demolished, there was no longer any necessity for keeping the window opening on each floor open without the installation of the window frame which was to be there installed, the superintendent of the general contractors notified the foreman of Superior to fill in the missing window frame on each floor. Although there is some dispute in the evidence as to whether Superior installed these window frames by starting at the bottom floor and working its way to the top, or by starting at the top floor and working its way down, there is no dispute that at some time on the morning of February 8, 1957 Superior installed a window frame on the eighth floor of this building at a time when the hod hoist was still in existence at a point opposite that floor. Superior knew at that time that the only means of entry or egress from the building at the point of the eighth floor was from the hod hoist through the window opening, and that if this window opening was in any way barred, the only other way in which the men on the hod hoist could get into the building was by climbing down the outside struts or x-bars of the hod hoist, until there was either a window opening still available, or until the men got to the ground. It would then be necessary for them to walk up the inside stairway to the eighth floor, do their work at that point,, then walk down the stairs again and climb up the outside of this hod hoist to get back to the place where demolition thereof was to continue. Despite this knowledge on their part, Superior went right about its business of installing these window frames, including the one on the eighth floor opposite the point where they knew the men of the Kelly Company were working on the hod hoist. Superior’s employees knew that this hod hoist was kept from toppling over by cables which went around the outside portion of the hod hoist and which were attached at each end to posts inside the building. The cables extended from outside of the building through a window on each floor to the inside of the building, and in order that the hod hoist be removed these cables had to be loosened through the operation of a turn buckle located in the building. The testimony showed that the cables were apparent to the employees of Superior, and that they saw these cables and knew that they had to be released before the hoist could be removed. Never- *273 tireless, and apparently ignoring the fact that McAllister and/or his crew would of necessity have to come into the building at the eighth floor or somehow get upon the eighth floor in order to release these cables, Superior installed this window frame on that floor, thus barring easy access in the usual manner, that is, by putting a plank across from the hod hoist to the window opening and just walking over that pMnk into the building.
Faced with this picture of this partially barred window opening which had the window frame installed, McAllister had the choice of either climbing down eight stories on the outside of this hod hoist or walking across the plank and attempting to get into the building through the openings in the window frame. There seems to be no question but that climbing down on the outside of the hod hoist presented a much greater danger. McAllister had no way of knowing that these 70- or 80-pound window frames were not securely fastened into the window by the use of jambs and blocks, and so he walked across the planks and attempted to get into the building through the opening in the window frame. As he did so, he fell into the building-together with the frame, which landed upon his arm and other parts of his body causing the injuries which will be hereinafter discussed. There appears to be no question, and the court finds that by installing this window frame at a time when its installation put the plaintiff in a position of danger, defendants and all of them were negligent. The general contractors failed in their duty to co-ordinate the work of their subcontractors and were further negligent in not only failing to supervise the work properly, but in advising the defendant Superior that it might go ahead with its installation of the window frames in the openings left on each floor, without first giving- McAllister and his crew an opportunity to completely demolish the hod hoist. There is nothing in the evidence which indicates any need for speed or haste in installing these window frames, and this accident would have been avoided and prevented if the defendant Superior had waited either a little while longer, or even until the day after the hod hoist was removed, before it filled in the frames in the window openings. As a matter of fact, the proof shows that Superior’s employees could very well have continued with most of its work on each floor, omitting only the window frame on those floors where the cables were attached inside the building. The court rejects completely the testimony of defendants to the effect that when they installed this window frame on the eighth floor, they informed the plaintiff that if he found it necessary to come into the building, they would remove the window frame and then rein *274 stall it. It does not seem reasonable that Superior’s employees would install this 70- or 80-pound window frame, knowing that they might have to remove it again within a relatively short time and then reinstall it. The testimony of defendants’ employees in this, as well as many other respects, indicates that their testimony is unworthy of belief.
Plaintiff was entitled to a safe place to work, and he was certainly entitled to freedom of entry into the building. It was for that very reason that the window openings were left without the window frames when defendant Superior first did its work on each floor. Barring those windows with these frames at a time when defendant knew that by doing so they were placing plaintiff in a position of danger, was a negligent act on the part of defendant Superior, and permitting this to take place makes the general contractors guilty of negligence.
Defendants urge that even if the court finds that they were negligent, plaintiff was himself guilty of contributory negligence as a matter of law. This contention is rejected by the court. Plaintiff found himself in a position where he had to choose between two possible risks. One was by going across the planks between the hod hoist and the building in the usual manner and attempting entry into the building through the openings in this window frame, while the other was by climbing down the outside of the x-bars of this hod hoist for a distance of about eight stories and then finding it necessary to climb up those bars again after he had finished his work on the eighth floor. It seems to the court that attempting to go through the open window frame presented the lesser of the risks involved, if it presented at that time any risk at all. Plaintiff certainly was not bound to anticipate that the window frames were not securely in place, even though their permanent installation required that they be further enforced by the use of concrete which was later to be placed around the outside of the frame. Plaintiff should not be expected to assume that this 70- or 80-pound frame was so installed in this open window that it could easily be jarred loose even if some little pressure was exerted against it by plaintiff’s going through the window frame. The court finds that not only did the defendant Superior place the window frame in the opening at a time when by doing so, they placed plaintiff in a position of danger, but that they did so in a careless and negligent manner and failed to install the supporting window jambs and blocks in a manner which would keep the window frame from falling out, as they were required to do if they did their work in a good and workmanlike manner. On all of the facts, the court has come to the conclu *275 sion that plaintiff was not guilty of contributory negligence in attempting, as he did, to go through the openings in the window frame.
Even if the court were to accept the contention of the defendants that plaintiff’s attempt to get into the building on the eighth floor by going through the window frame opening was an improper procedure, the most which can be said about his actions is that he failed to exercise the best judgment under the circumstances. Such failure to exercise “ the best judgment ” is not contributory negligence and it has been so held by our courts. (Buel v. New York Cent. R. R. Co., 31 N. Y. 314; Roll v. Noihern Cent. Ry. Co., 15 Hun 493, 80 N. Y. 647; Voak v. Northern Cent. Ry. Co., 75 N. Y. 320; Coulter v. American Merchants’ Union Express Co., 56 N. Y. 585; Twomley v. Central Park., North & East Riv. R. R. Co., 69 N. Y. 158; Heath v. Glens Falls, Sandy Hill & Ft. Edward St. R. R. Co., 90 Hun 560, 562.)
Plaintiff found himself suddenly in a position of peril. He was on a hoistway which to him in his line of work was perfectly safe. When he got onto the hoistway he had easy access therefrom into the building. The defendants installation of the window frame suddenly created a perilous condition, because plaintiff was left with no way of escape from this outside structure which was being demolished, except through the iron window frame or by climbing down eight floors on the outside x-bars. What had theretofore been a safe place of work, suddenly became a place from which escape was impossible except in one of the two manners already described. If it be assumed that plaintiff found himself in a position of peril, and failed to exercise the best judgment, his actions may not be considered as contributory negligence. So it was held in Stone v. Thomas (84 N. Y. S. 2d 257, 258, verdict reinstated and judgment affd. 277 App. Div. 810, affd. 301 N. Y. 741). To the same effect see Ward v. Ward (232 N. Y. 195); Kolanka v. Erie R. R. Co. (215 App. Div. 82). The court has however come to the conclusion that plaintiff’s actions in attempting to go through the iron window were perfectly proper, that he did what the ordinary, prudent man in his position would have done under similar circumstances, that going through the iron framework of the window, if it were properly installed, presented no apparent perils to Mm when he did so, whereas the only other method of escape from the hoistway was obviously dangerous. Under these circumstances, by no fair interpretation of the evidence may the plaintiff be held contributorily negligent.
*276 There is no question but that plaintiff sustained serious injuries. The X rays received in evidence show that there was a complete break in his right humerus immediately alb ove the right elbow. He undoubtedly suffered severe pain and agony, and after a period of hospitalization and other immediate disability, the X rays taken shortly before the trial showed that the end result was a deformity of the right elbow. His other injuries were merely superficial, but the serious injury which he sustained to his right elbow has left him with a disability in the use of his right arm. There is certainly no question but that he could no longer do the kind of work which he was doing prior to the accident. Although about 69 years of age when the accident happened, plaintiff now, at 72 years of age, appeared to be a hale and hearty type of individual, walking in a manner which belied his 72 years, and apparently able to do the kind of work which he had been doing for 34 years before the accident, were it not for the disability in his right arm. The testimony on the trial shows that he has been unable to work since the day of the accident and from the testimony of defendants’ own physician, the court finds that he would have been able to work for about two more years from the date of the trial, were it not for this accident. Although some attempt was made by defendant to show that he can do some other type of work, the court is convinced that at his age, he could get no other type of employment except in the industry in which he was engaged for 34 years before his accident. He has lost $186.50, his weekly earnings, from the day of the accident to the trial, a period of 2 years and 10 months, or 147 weeks. This amounts to a loss of wages in the sum of $27,415.50. In addition, his lost wages for the next two years, during which his ability to have worked, were it not for this accident, was conceded by defendants’ physician, amounts to the sum of $19,396. However, since plaintiff will, by this judgment, receive said future earnings at the present time in one lump sum, the court deducts 6% therefrom or the amount of $1,163.76, thus making the allowance for future lost earnings, the sum of $18,232.24. This amount, when added to the already lost earnings of $27,415.50 and the other special damages of $821.96, makes a total out-of-pocket loss to plaintiff in the sum of $46,469.70. For his injuries and the disability occasioned thereby, for his pain and suffering and his inability to normally use his arm during the rest of his life, the court feels that for the period of his life expectancy of 9.46 years, or, roughly, 9 1/2 years, plaintiff is entitled, even commuted to its present-day value, to an allowance in the sum of $15 a day for those *277 9 1/2 years. That amounts to $5,475 a year for 9 1/2 years or $52,012.50. Adding this sum to the amount of special damages already discussed, makes a total of $98,482.20, for which amount decision is hereby granted to the plaintiff against all three defendants. The motion made by the plaintiff for judgment at the end of the entire case is granted as herein indicated with an exception to the defendants, and the motions by the defendants for judgment are in all respects denied with an exception.
Thirty days’ stay and 60 days to make a case are granted to the defendants.